UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DARLENE SALMELA,                                CIVIL NO. 09-2309 (JNE/JSM)

          Plaintiff,

v.                                              REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.

JANIE S. MAYERON, United States Magistrate Judge

Defendant has denied plaintiff Darlene Salmela's ("Salmela") application for supplemental security income under the Social Security Act, 42 U.S.C. §§ 402(d), 423. Plaintiff brings this action seeking review of the denial of benefits. The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 11] and defendant's Motion for Summary Judgment [Docket No. 22]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

I.      **PROCEDURAL BACKGROUND**

Plaintiff Darlene Salmela ("Salmela") is currently receiving supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c, arising out of an application filed on May 17, 1991 and disability she claimed commenced on April 1, 1986. Tr. 125, 126, 165-73. On November 3, 2000, Salmela

1

filed an application for child's insurance benefits for a disability commencing prior to her reaching 22 years of age, based on her stepfather's earning record and alleging that she became disabled starting on October 4, 1974.  Tr. 176-78.  The application was denied initially, upon reconsideration and as part of a June 25, 2003 hearing decision, based on the finding that Salmela was not a dependent of her stepfather at the time of his death, and as such did not meet the dependency requirement for entitlement to child insurance benefits as a stepchild.  Tr. 30-36, 180-83, 186-87, 207-12.  On June 3, 2004, the Appeals Council issued a ruling that Salmela did meet the dependency requirement for child disability benefits as a stepchild, and remanded the case for an adjudication as to whether Salmela had established a disability prior to her 22nd birthday.  Tr. 21-29.

Salmela's application regarding whether she was disabled was denied initially and upon reconsideration.  Tr. 37-41.  At Salmela's request, an administrative hearing was held on March 16, 2007, before Administrative Law Judge ("ALJ") Michael Quayle.  Tr. 17.  Salmela was represented by legal counsel during the hearing.  Id.   Testimony was taken at the hearing from independent vocational expert Edward Utities ("VE"), Jay Borth, a friend of Salmela's, and from Salmela.  Tr. 17, 379.  On June 22, 2006, the ALJ issued a decision denying Salmela benefits.  Tr. 14-20.  Salmela filed a Request for Review of the ALJ's decision with the Appeals Council and submitted additional evidence.  Tr. 9-10.  The Appeals Council denied Salmela's request for review and upheld the ALJ's decision denying benefits to Salmela (Tr. 9-12), making the ALJ's findings the final decision of defendant.  See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g).  [Docket No. 1].  The parties now appear before the

Court on Plaintiff's Motion for Summary Judgment [Docket No. 11] and Defendant's Motion for Summary Judgment [Docket No. 22].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  In order to qualify for child insurance benefits under the Social Security Act, a claimant needs to show that she is the child of an insured person and has a disability which began prior to her reaching twenty-two years of age and lasted to the time of her application for benefits.  See 42 U.S.C. §§ 402(d)(1), 423(d)(1); 20 C.F.R. § 404.350; see also Anderson v. Heckler, 726 F.2d 455, 456 (8th Cir. 1984) ("To be eligible for disabled benefits, a claimant must prove that he or she is under a disability at the time of the claimant's application for benefits . . . and the disability must be continuous from before age 22 until the claimant's application.").

### A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq.  In determining whether a claimant seeking child insurance benefits was disabled prior to the age of 22, the Social Security Administration ("SSA") follows the five-step sequential evaluation process described in 20 C.F.R. § 404.1520(a)(4) requiring the ALJ to make a series of factual findings regarding the claimant's work

history, impairment, residual functional capacity, past work, age, education, and work

experience.  See Pollard v. Astrue, NO. CIV.09-513 (PJS/FLN), 2010 WL 2557771 at

*4-6 (D. Minn. June 08, 2010), aff'd June 23, 2010 Order [Docket No. 27] (J. Schiltz).

The five steps to be analyzed by the ALJ are:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 404.1560(b).)

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 404.1560(c).)

20 C.F.R. § 404.1520(a)(4).[1]

---

[1]     The Eighth Circuit described this five-step process in Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994), vacated on other grounds, as follows:

### B.     Administrative Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482.  The decision of the Appeals Council (or of the ALJ if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C.     Judicial Review

Judicial review of the ALJ's decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and consider:

1.     The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of plaintiff's impairments.

---

The first step asks if the claimant is currently engaged in substantial gainful employment.  If so, the claimant is not disabled.  If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.  If not, the claimant is not disabled.  If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled.  The fourth step asks if the claimant's impairments prevent her from doing past relevant work.  If the claimant can perform past relevant work, she is not disabled.  The fifth step involves the question of whether the claimant's impairments prevent her from doing other work.  If so, the claimant is disabled.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Sec.' of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by the Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).  Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Hunt v. Massanari, 250 F.3d 622, 623 (8th Cir. 2001); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  It is "less than a preponderance [of evidence], but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.   Culbertson, 30 F.3d at 939.   The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

A claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).

## III.   THE DECISION UNDER REVIEW

### A.   Vocational Background

Salmela was 44 years old when she applied for child insurance benefits in November 2000, claiming that she became disabled on October 4, 1974.  Tr. 76.  Her birthdate was October 4, 1956.  Tr. 125.  She reached the age of 22, for the purposes of receiving benefits, on October 3, 1974.  Tr. 19, 175; see also 20 C.F.R § 404.102 ("You reach a particular age on the day before your birthday.").  She graduated from high school in 1975.  Tr. 456.  Salmela has no past relevant work experience.  Tr. 397-98.

### B.   ALJ's Findings of Fact

The ALJ concluded that plaintiff was not eligible for child's insurance benefits. Tr. 20.  The ALJ stated that he made the following findings based on the entire record:

**1.     The claimant attained age 22 on October 3, 1978, the day before her 22 birthday (20 CFR 404.102).**

**2.     The claimant has not engaged in substantial gainful activity since October 4, 1974, the alleged onset date (20 CFR 404.1530(b) and 404.1571 *et seq.*).**

The claimant has no history of past relevant work activity. She has been supported by her parents as well as auxiliary benefits and public benefits.

**3.     The objective medical evidence fails to establish the existence of a medically determinable impairment prior to the date the claimant attained age 22 that could have reasonably been expected to produce the claimant's symptoms (20 CFR 404.1520(c)).**

Absent objective medical evidence, the claimant's symptoms alone cannot establish the existence of a medically determinable physical or mental impairment. An impairment must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, regardless of how genuine the claimant's complaint may appear to be, when there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, a finding of not disabled is required at step two of the sequential evaluation process (20 CFR 404.1529 and SSR 96-4p).

The undersigned initially notes the lack of medical evidence from the period prior to 1979. In connection with her 1991 Supplemental Security Income claim, the claimant asserted disability on the basis of mental impairments. A consultative examination included WAIS-R testing and established scores of 78/73/75 placing the claimant in the borderline range of intellectual function. Further testing reflected a dependent personality disorder. While an inference of borderline intelligence could be extended prior to initial testing in 1991 in connection with her 1991 Supplemental Security Income claim, there are no available records to establish mental impairments.

Based on standardized testing in 1967 and 1968, the claimant tested at the 4-5 grade equivalency on the California Test in grade 5 and at the 5-1 grade equivalency in grade 6. (Exhibits B1E and B7E). Her Iowa Test scores showed a grade equivalency of 4-1 in grade 4, 5-0 in grade 5, and 5-5 in grade 6. Her grades were poor but did not appear to be clearly connected to intelligence based on her standardized scores. The claimant reported that she graduated with Willow River High School without special education services. (Exhibit B6F). She denied any history of gainful employment. In 1999, the claimant sought psychological evaluation to establish disability for the purpose of securing benefits. Upon evaluation of past records through HDC, Rena Bumgardner, ACSW, LISCW, was unable to determine disability prior to age 18. There was no previous history of hospitalization or medication treatment.

Accordingly, the objective medical evidence does not establish the existence of a medically determinable impairment that could have reasonably been expected to produce the claimant's symptoms.

**4.     The claimant was not under a disability as defined in the Social Security Act, at any time prior to October 3, 1978, the date she attained age 22 (20 CFR 404.350(a)(5) and 404.1520(c)).**

Tr. 19-20 (emphasis in original).

### C.     ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step procedure.  At the first step, the ALJ concluded that Salmela had not engaged in substantial gainful activity since the alleged onset of disability.  At the second step, the ALJ found that Salmela did not have a medically determinable physical or mental impairment prior to the date she reached age 22.   Given that the ALJ did not find a medical impairment at the second step, he did not continue with the remaining steps of analysis.

## IV.   ISSUES UNDER REVIEW

The issue before the Court is whether substantial evidence in the record supports the decision by the ALJ that Salmela was not disabled for the purposes of receiving benefits because she did not have a medically determinable impairment before reaching the age of 22.

Salmela argued that the evidence supports a finding that she had a medically determinable severe impairment before reaching the age of 22 because the Veterans Administration ("VA") found that she was disabled before the age of 18 – a finding that

the ALJ neither mentioned, analyzed nor gave any weight.[2]   See Plaintiff Darlene

Salmela's Memorandum of Law in Support of Motion for Summary Judgment ("Pl.'s

Mem.") [Docket No. 12] at pp. 9-10; Plaintiff Darlene Salmela's Reply/Supplemental

Memorandum of Law in Support of Motion for Summary Judgment ("Reply") [Docket No.

25] at pp. 2-3.  Salmela also submitted that the record showed that she had a medically

determinable severe impairment prior to the age of 22 because the records reflected

that as a child she had difficulty in school and with intelligence testing.  Pl.'s Mem. at p.

9; Reply at p. 3.  Salmela asserted that this evidence, in conjunction with the records

from the 1990s (which she claimed demonstrated she had intelligence, behavioral and

parenting issues that led to the disability finding by the SSA in 1991), showed that these

impairments have existed all of her life.  Pl.'s Mem. at pp. 9-10.  In short, because there

was no traumatic or life changing event which occurred before 1991 when she was

deemed disabled by the SSA (other than the death of her sister which took place when

Salmela was 5 years old), the Court should find that she was disabled before 1978.

Pl.'s Mem. at p. 10; Reply at p. 4 ("Nothing happened. No traumatic event occurred.

She just got older.").

Salmela acknowledged that there is not a substantial amount of evidence before

1978.  Id. at p. 10; Reply at p. 4.  Salmela blamed the SSA for the dearth of records,

complaining that many documents that had been submitted to the ALJ and to the

Appeals Council, including school records and records from the VA, had been lost or

misplaced.  Pl.'s Mem. at pp. 7, 9, 11.  However, after Salmela filed her motion for

---

[2]     In both Salmela's brief and the Affidavit of her attorney, Salmela represented that
the VA records and decisions were both discussed with the ALJ at the hearing and
submitted to the ALJ at the hearing and Appeals Council.  See Pl.'s Mem. at p. 6 n.4;
Affidavit of Sean M. Quinn ("Quinn Aff.") [Docket No. 14], ¶¶ 3-6.

summary judgment and before the SSA filed its cross-motion, the Commissioner filed a supplemental set of exhibits and a certification that they had been inadvertently omitted from the administrative record.[3]  See Docket No. 21.  These exhibits included Salmela's Willow River school records and records pertaining to VA benefits.

Based on all of this evidence, including the supplemental record, Salmela urged that the ALJ's decision should be overturned, and asked the Court to grant summary judgment, or in the alternative, remand the case back to the SSA so that all of the evidence could be considered and a medical expert be retained to determine whether entire record sufficiently demonstrates that she was disabled prior to 1978.  See Pl.'s Mem. at pp. 11-12.

In response, the Commissioner argued that because substantial evidence supports the ALJ's finding that Salmela was not disabled prior to October 4, 1978, when she turned 22 years of age, the Court should affirm the ALJ's decision and grant summary judgment to the defendant.

---

[3]     Salmela's counsel produced to the Court those school records and VA records he claimed he had submitted to the ALJ and Appeals Council.  See Quinn Aff., ¶ 6 (and attached exhibit).  These records included grades and test scores from her schooling in Minneapolis and Willow River; communications between Salmela and the VA; communications between counsel and the VA; documents pertaining to VA's determination on whether civil service income counts towards VA pension eligibility; payment history; the decision by the VA that Salmela became permanently incapable of self-support prior to October 4, 1979 by reason of mental disability; and documents related to the denial by the VA for non-service-connected death pension.  The pertinent documents—the Willow River school records and the decision by the VA that Salmela became permanently incapable of self-support prior to October 4, 1979 by reason of mental disability—were included in the supplemental record provided by the Commissioner.  The Court could not locate the Minneapolis school records in the supplemental record.

## V.    RELEVANT RECORD

The Minneapolis school records cover grades 2-4, but the grading system is not evident in the record.  See Quinn Aff., Exhibits  A. fourth grade aptitude test indicated that Salmela scored in the 2% in the verbal category and 3% in the non-verbal category. Another fourth grade scholastic achievement test showed that Salmela tested in the 31% for total language category and the 1% for total arithmetic category.  Id.

As for the Willow River school records, Salmela's high school records showed that she maintained approximately a "D" grade average.  Tr. 457.  The California and Iowa intelligence tests taken by Salmela in fourth grade showed that she had a 4th grade equivalency level; a range of 4-5 to 5-0 when she was in fifth grade; and a range of 5-1 to 5-5 when she was in sixth grade.  Id.  In tenth grade, Salmela tested in the 23% for reading comprehension, 10% for vocabulary; 19% for language usage, 70% for spelling, 3% for math, 28% for social studies and 15% for science.  Id.

There are no other records regarding Salmela's intelligence or mental condition until September 24, 1990, when Donn E. Nelson, Ph.D. ("Dr. Nelson") conducted a psychological evaluation of Salmela.  Tr. 290-300.  Salmela reported that she had received training as a nursing assistant but had a very limited work history.  Tr. 290. Salmela also admitted that parenting was difficult.  Id.  She denied any psychiatric treatment or hospitalization, except for giving birth.  Id.  Dr. Nelson found Salmela presented as emotionally needy, with very limited parenting skills.  Id.  Dr. Nelson noted that Salmela performed at the upper end of the "borderline" range of intellectual functioning with a Weschler Adult Intelligence Scale ("WAIS") full scale I.Q. of 81, which placed her at the 10th percentile.  Id.  Salmela's assets were verbal comprehension,

fund of general information, vocabulary and new learning ability.  Id.  Her deficits were numerical reasoning and visual motor integration skills.  Id.  Dr. Nelson noted that Salmela's variable attention and concentration skills may have affected her performance on these tasks.  Id.  Dr. Nelson opined that at this level of intellectual functioning, Salmela could function as an independent adult and comply with normative role and social behavior expectations, but she would have considerable problems with complex and abstract reasoning, learning and problem solving.  Id.  According to Dr. Nelson, persons at Salmela's level of functioning could generally handle unskilled and semi-skilled labor with more intensive training.  Id.

Dr. Nelson found Salmela was alert, oriented, and generally cooperative during her assessment.  Id.  Her mood and affect were appropriate, her speech was logical with no evidence of psychotic thought, and she showed no signs of hallucination or delusions.  Tr. 290-91.  Salmela showed some limitations in her awareness and judgment, and seemed unaware of the inappropriateness of showing up several hours late for her appointment.  Tr. 291.  Dr. Nelson opined that Salmela was emotionally needy and dependent, without any indications of depression, and that her over-dependency on others was a fairly long-term problem.  Id.  Dr. Nelson also found that Salmela could benefit from an independent living skills program and that she needed some work with her parenting skills.  Id.

On January 25, 1991, Foster Gilliland, M.S. ("Gilliland"), with the Human Development Center, performed a psychological evaluation of Salmela in order to determine her ability to parent.  Tr. 304-309.  The Minnesota Multiphasic Personality Inventory ("MMPI"), the WAIS, the Rorschach and the House-Tree-Person drawing tests

were administered to Salmela.  Tr. 304.  At the time of her testing, Salmela's children had been removed from her home.  Id.  According to Gilliland, the tests administered to Salmela showed that she functioned within the borderline range of measured intelligence; she evidenced some strength in memory information and verbal expression skills; she evidenced a particular difficulty in solving social problems; she was impulsive and unable to delay gratification; she did not learn from past mistakes and tended to make the same errors again and again.  Tr. 308.  Gilliland stated that the testing also showed that Salmela had many of the same characteristics of those who have attempted or effected suicide, although she was not suicidal at the time of her testing. Id.  Gilliland noted that Salmela was more depressed than she let on and that her depression was a long-term trait characteristic, which would be difficult to change.  Id. Gilliland opined that Salmela needed a very structured and safe environment with consistent controls in place to help her deal with the needs of her children and to ensure that she is not victimized.  Id.  Gilliland found that traditional therapy would be of little benefit to Salmela, as she could not sustain self-protection behavior by herself, and that Salmela may need to have a psychiatric evaluation done to determine if she required medications.  Tr. 309.

On November 25, 1991, Salmela went to the Gateway Family Health Clinic in order to have an examination done for SSI purposes.  Tr. 559.  It was noted that Salmela's health had been "reasonably good" in the past.  Id.  She reported having chronic anxiety and was dealing with her public assistance running out and was not sure where she would be living in the near future.  Id.  Salmela displayed insecurity about being insufficient.  Id.  Salmela noted that she had a worse time in the winter

because she questioned her driving abilities. <u>Id.</u> Salmela did not appear delusional, hallucinatory, suicidal or homicidal. <u>Id.</u> The assessment was that Salmela was suffering from probable anxiety neurosis, possible mild depression and inferior personality disorder. <u>Id.</u> Salmela was started on a notriptyline[4] prescription. <u>Id.</u>

On May 17, 1991, licensed psychologist Robert Schauerhamer ("Schauerhamer") conducted a psychological evaluation of Salmela. Tr. 301-03. The evaluation was conducted to determine if Salmela had the requisite ability to care for her children. Tr. 301. Schauerhamer observed Salmela and her three children in their trailer home. <u>Id.</u> Salmela appeared to be somewhat inappropriate with revealing information that was not pertinent to the evaluation. <u>Id.</u> Salmela greeted her children with excessive excitement in a childish tone of voice and encouraged her children to use the same tone. <u>Id.</u> Salmela appeared competitive and rapid in her speech with her daughter and would get very loud and disorganized with her speech when she addressed her five year old son. <u>Id.</u> Salmela was hopeful that she could meet the county's conditions so that she can retain her children and thereby be eligible for benefits. Tr. 302. Salmela appeared to lack the ability to entertain or interact with her children, evidenced by the observation that when her children wanted any attention she would redirect them to watching television. <u>Id.</u> Salmela noted that she wanted her three children home with her so she could increase her income. <u>Id.</u> Salmela seemed confused and overwhelmed by the needs of her children; she frequently asked for advice and would talk out loud second-guessing her choices and reprimanding herself. <u>Id.</u> Schauerhamer also noted that Salmela had a poor awareness of the time and schedules, and she presented

---

[4] Notriptyline: "Prescribed for depression, with or without symptom of anxiety or sleep disturbance. . . ." THE PILL BOOK (2002).

numerous instances of being unable to deal with the safety concerns of her children. Tr. 302-03.   Schauerhamer opined that Salmela continued to have numerous issues with her personal life that would prevent her from attending to the needs of her children. Tr. 303.   Schauerhamer found that Salmela was unable to independently make safety determinations regarding the needs of her children and that her thinking was too disorganized to make a commitment to the safety of her children.   Id.   Schauerhamer also noted that while Salmela cared for her children, she appeared to address them as objects of childish affection without concern for their needs.   Id.

On June 22, 1992, Administrative Law Judge Larry Hatch ("ALJ Hatch") issued a decision concluding that Salmela qualified for SSI benefits, as the evidence supported a finding that Salmela had been disabled since May 17, 1991.   Tr. 167-170.   ALJ Hatch noted that Salmela claimed that she had been disabled since April 1, 1986, due to a learning disability, poor memory and nervousness.   Tr. 168.   The record included a 1991 psychological examination and testing, which indicated that Salmela was functioning with a borderline range of intelligence based on her WAIS-R scores and her IQ.   Id.   In addition, the testing demonstrated that Salmela had a personality disorder, which included impulsiveness, an inability to learn from past mistakes and difficulty dealing with social problems.   Id.   These psychological problems likely resulted in Salmela losing her children.   Id.   ALJ Hatch also relied on a 1992 report from her treating psychotherapist, indicating that Salmela did not have the capacity to make clear cut decisions and had difficulty maintaining her attention on one subject.   Id.   The treating psychotherapist opined that Salmela would be unable to make even simple

work-related decisions and that she would require extraordinary supervision in the workplace. Id.

ALJ Hatch stated that Dr. Kent Newman, Ph.D. ("Dr. Newman") had testified at the SSI hearing that based on the evidence in the record, Salmela had borderline range of intelligence and deficits in the ability to recall and the ability to anticipate the outcomes of her actions. Id. Dr. Newman also indicated the presence of dependent personality disorder. Id. According to Dr. Newman, the combined effects of these impairments resulted in marked limitation restrictions in Salmela's activities of daily living, a marked limitation in her ability to maintain social functioning and frequent deficiencies in concentration, persistence or pace that resulted in her failure to complete tasks in a timely manner. Id. Dr. Newman indicated that Salmela's impairments "are of long-standing duration." Tr. 169.

Based on all of this evidence, ALJ Hatch concluded that the combined effects of these impairments were sufficiently severe to preclude Salmela from performing basic work-related activities and precluded her from the performance of substantial gainful activity at all levels of exertion. Id.

In December 1994 and January 1995, Harold Vinnes, Ed.D. conducted a psychological evaluation of Salmela for a Carlton County court regarding her ability to parent her youngest son. Tr. 292-300. In his background of Salmela, Dr. Vinnes noted that when Salmela was five years old, her fifteen year old sister was killed in an automobile accident. Tr. 292. Her father did everything he could to ensure the safety of Salmela, including not allowing her to learn to drive. Id. Salmela's father also overindulged her by giving her anything she wanted. Id. Salmela reported that she was

an obedient child and there was seldom any reason to discipline her because she followed the rules, was herself kind and generous, finished high school and got married when she was 21 years old.  Id.

In 1977, Salmela married and she became pregnant.  Tr. 293.  Her husband and his family contested the paternity of the child.  Id.  In 1978, Salmela's father passed away, which was a shock for Salmela, who depended on him.  Id.  Salmela provided that she became desperate after her father's death and ended up leaving her husband because he was not providing for her like her father had done, although her primary motive for leaving was another man.  Id.

In 1980-81, Salmela's mother married a second time to a man who already had children and she left Salmela.  Id.  This was a shock for Salmela who began to experience moods of loneliness and depression; she reported that loneliness had always frightened her after the death of her sister and that she has always wanted to be with someone.  Id.

Salmela stated that she met a man in 1985 who really liked her and she believed that this would be the man who would treat her special like her father had done.  Id.  Salmela became pregnant and the man left her.  Tr. 293-94.  Salmela met a third man, and she became pregnant again; however, the third man would not marry her and he was physically abusive towards her.  Tr. 294.

According to Salmela, the years of 1988-1992 were an all-time low for her, as she gave birth to her third child and felt that all of the parenting responsibility fell on her shoulders.  Id.  She came to rely on a county nurse, who according to Salmela, filed a petition to have her children taken away from her.  Id.  Salmela admitted to allowing her

oldest daughter to stay home from school on some days to help her care for the baby.
Id.

In 1994, Salmela gave birth to a fourth child.  Tr. 295.  Social services took the
child away from Salmela and placed it in foster care, since she had lost custody of her
other children.  Tr. 539.

Dr. Vinnes indicated that Salmela scored within the average range among adult
norms in both the verbal and analytical portions of the WAIS.  Tr. 295.  Dr. Vinnes noted
a deficit in her ability to concentrate and organize her thoughts, which ranked in the 9th
percentile.  Id.  Salmela's MMPI-2 test showed that she showed good ego strength, she
was not disabled, she liked associating with people, and she relied on social interaction.
Tr. 296.  Dr.  Vinnes opined that Salmela showed better control of herself than most
people, was not punitive towards others, and she exhibited no signs of being verbally
hostile towards others (even when times were tough).  Id.  Dr. Vinnes noted no
evidence of significant mental illness or depression.  Id.

Dr. Vinnes opined that all the information provided evidence that Salmela
suffered a serious personal crisis between the years of 1988 and 1993 and a
corresponding compromise in functioning during that period of time and depression.  Tr.
297.  According to Dr. Vinnes, this was fed by the childhood death of her sister, the
death of her father, the separation from her mother, the demands of an early childhood
and independence, and a succession of unsuccessful relationships with men.  Id.  The
compromise in her ability to think, due to these crises, was evident in a 1991
psychological evaluation of Salmela, which showed that she had serious intellectual
deficits.  Id.  Dr. Vinnes opined that her test scores during that evaluation were typical of

an individual under extreme psychological distress and Dr. Vinnes faulted the evaluator for not taking into account a possible attention deficit disorder or circumstances in her life that were responsible for the scores, as opposed to finding that Salmela functioned in the borderline range of function.  Id.  Based on his review of the entire record, the recent testing conducted and his interactions with Salmela, Dr. Vinnes concluded that she was not "an individual with subnormal intelligence who is too immature to control herself.  Her intelligence ranks within the normal range."  Tr. 299.  Dr. Vinnes noted that Salmela became despondent due to a crisis between 1988 and 1993, which impaired her ability to function and parent.  Id.  Dr. Vinnes's report also indicated that she was making a recovery from her crisis and was getting better.  Id.  Dr. Vinnes recommended that Salmela "develop a life of her own, to acquire work skills and experience, to develop relationships with other women, and to further her own interests and hobbies, etc."  Tr. 300.

On April 15, 1999, Salmela had a consult with social worker Rena Bumgardner, A.C.S.W., L.I.C.S.W. ("Bumgardner").  Tr. 526.  Salmela reported that she was there because her mother passed away, she wanted to see if she could get more income, and she needed documentation to present to the appropriate government officials that she was disabled prior to age 18.  Id.  Salmela noted that her father was a federal employee prior to his death and she wanted to find out if she might be eligible for income as a surviving disabled dependent of a deceased government employee.  Id.  Salmela told Bumgardner that she initially went to grade school in Minneapolis, but that her parents moved to Willow River because school officials in Minneapolis wanted to hold her back in grade school.  Id.  Salmela stated that she graduated from high school without the

need of any special classes.  Id.  Salmela told Bumgardner that she was seeing two different healthcare providers, but that she stopped going to see them because they would not help her get any more money.  Id.   Bumgardner noted that Salmela presented herself in a very child-like manner and smiled inappropriately throughout the meeting.  Tr. 527.  Salmela responded to questions in a fairly concrete fashion and described herself as being frightened and unable to take care of herself.  Id. Bumgardner found Salmela to have a reasonably good vocabulary.  Id.  According to Bumgardner, Salmela appeared overall to be functioning at less than an average level intelligence and that Salmela's clearly stated goal was to secure documentation that would allow her to get more benefits than she presently does from SSI.  Id. Bumgardner diagnosed Salmela with mild mental retardation with the recent death of her mother serving as psychosocial stressor.  Id.  Bumgardner also assigned Salmela with a GAF score of 60.[5]  Id.

On April 22, 1999, the VA found that prior to October 4, 1974, Salmela "became permanently disabled by reason of physical or mental disability diagnosed as autism with mental retardation," and determined she was entitled to VA benefits.  Tr. 454-55. The VA relied on the social security records and a letter from Dennis Turner, her high school counselor.  Id.

---

[5]     The Global Assessment of Functioning scale ("GAF") is used to assess an individual's overall level of functioning.  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000 Revision)).  The lower the score, the more serious the individual's symptoms.  See id.  A GAF of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and coworkers).  Id.

On May 18, 1999, Bumgardner sent a letter to Salmela notifying her that she had not received any documentation from her health providers that would indicate Salmela was disabled prior to age 18, and that any evaluation at this point could determine her current level of functioning, but not her status prior to age 18.  Tr. 525.

On September 21, 1999, the Merit Systems Protection Board, Central Regional Office ("Merit Systems Board"), reversed a decision by the Office of Personal Management ("OPM") issued on April 29, 1999[6] denying Salmela survivor annuity benefits as the unmarried dependent child of her stepfather.  Tr. 444, 445.  The OPM had denied Salmela's application for benefits because her mother did not list Salmela as a disabled, dependent child incapable of self-support when she applied for survivor benefits after the death of Salmela's step-father in 1979, and because Salmela had not established that she had incurred a mental or physical disability prior to the age of 18. Tr. 445.

In his decision, the Administrative Judge for the Merit Systems Board (AJ-MSB) stated that to obtain survivor annuity benefits, Salmela had the burden of establishing that she was an unmarried dependent child of a deceased federal employee who "is incapable of self-support because of mental or physical disability incurred before age 18."  Tr. 445.  The AJ-MSB indicated that based on the standard developed by the Social Security Administration, the phrase "incapable of self-support" is defined to "mean that an appellant's impairment must render her incapable of performing any occupation suitable for her age, education work experience, and residual functional capacity."  Tr. 445-46 (citations omitted).

---

[6]     The OPM is the human resources agency for the federal government.  <u>See</u> www.opm.gov.

The AJ-MSB stated that Salmela had submitted documentation showing she had borderline intellectual functions (Full Scale IQ of 75), a dependent personality order, and significant deficits in immediate recall, and indicated that she was receiving SSI benefits based on her borderline intellectual functioning and dependent personality disorder.  Tr. 445, 446.

In reversing the OPM, the AJ-MSB first determined that Salmela was incapable of supporting and caring for her children and of self-support.  Tr. 447.  He made that finding based on the following evidence:  Salmela completed high school, married and gave birth to her first child in 1978.  Tr. 446.  She lived with her parents; her husband did not live with them.  Id.  Salmela's step-father died in 1979.  Id.  Salmela divorced in 1981, and Salmela and her baby lived with her mother until her mother remarried and moved.  Id.  Salmela then lived alone with her baby, but talked to her mother daily and her mother helped Salmela clean the home where she lived.  Id.  Salmela met another man, and had a second child with him in 1985, but he did not live with her or care for the child.  Id.  She had a third child with third man in 1990, who also never lived with her or the children.  Id.  Salmela's children were taken away from her in 1990 because she could not care for the children properly and because of her borderline intellectual functioning.  Id.  Salmela never had been employed except for two days planting trees in 1986.  Id.  Salmela testified she could not maintain the job because it involved math (counting bundles of seedlings) and she could not count high numbers.  Id.

Next, the AJ-MSB determined that Salmela had shown by a preponderance of evidence that she had incurred a disability before the age of 18.  Tr. 448.  He based that determination on the following evidence: The records showed that she started taking

special education classes from fourth grade and beyond and performed in the bottom five percent on standardized tests throughout grade school and high school.  Tr. 447. Salmela's high school counselor, Dennis Turner, considered her disabled at the time. Id.  In addition, Salmela had submitted a statement from a Dr. Etterman who wrote that Salmela had a learning disability and attention deficit order and marked the age of onset as birth.  Id.  A psychological evaluation in 1991 showed that Salmela had an IQ of 75, and Dr. Kent Newman, an expert in psychology, testified at her SSI benefits hearing that Salmela's disabilities and impairments were "long-standing in duration."  Id.

The AJ-MSB concluded that the record showed that Salmela's "borderline intellectual functioning, learning disabilities and dependent personality order were incurred before the age of eighteen."  Id.  In reaching on this decision, he relied on Salmela's testimony that she was afraid of school and wanted to be at home with her parents; she depended on her school counselor and others to manage school; she graduated high school with a "D" average; she never held down a job; and Dr. Etterman and Dr. Newman both believed that she has had "these intellectual and functional problems all of her life."  Tr. 447-48.

In October 2004, an evaluation of Salmela's records by state agency psychologist Dr. James Alsdurf. Ph.D. ("Dr. Alsdurf") was performed.  Tr. 566.  The assessment was for the period between October 3, 1974 to October 4, 1978.  Id.  Based on his review of the available record, Dr. Alsdurf determined that Salmela did not suffer from any medically determinable impairment.  Id.  Dr. Alsdurf noted that Salmela, in all of her previous applications, placed her onset of disability as the year 1986 or 1991.  Tr. 578.  Dr. Alsdurf also noted a 1991 Human Development Center psychiatric evaluation

that provided Salmela had no history of a previous hospitalization or medication, she had been in therapy since 1987, she had the ability in 1991 to drive all of the time and make three meals a day, and there were no medical sources for the time period of 1974-1978.  Id.

In September 2005, another evaluation of Salmela's records by state agency psychologist Dr. Paul Berry, Ph.D. ("Dr. Berry") occurred.  Tr. 584.  This assessment was for the period between October 4, 1978 (age 22) to 1987.  Id.  Dr. Berry concluded that Salmela suffered from borderline intellectual functioning and pathological dependency during this time period.  Tr. 585, 591.  Dr. Berry found that Salmela had a mild restriction of activities of daily living; a moderate restriction to maintaining social function and maintaining sufficient concentration, persistence or pace.  Tr. 594.  Dr. Berry noted that Salmela suffered from borderline intellectual functioning but that the testing determining this had been completed in 1991.  Tr. 596.  In addition, Dr. Berry noted that the oldest medical document available was 1987 and there was a reference to decreased cognition and a provisional diagnosis of a dependent personality, but no indication of depression.  Id.  According to Dr. Berry, the SSA's finding in 1991 that Salmela was disabled was based on the combined impairments of borderline intellectual functioning, dependency, and depression/anxiety.  Id.  Towards the age of 22, there was no indication of any depression and Salmela and indicated that in 1992, her doctors believed that her condition had worsened over time.  Id.  The evidence showed that in 1991, Salmela could drive, cook, clean, shop, and read the newspaper, but that beginning in 1991 there appeared to be a diminishment in her capability as it related to

daily activities of living, which was when her children were removed from her custody.

Id. Dr. Berry's conclusion was as follows:

> For the period age 22 (1978) to 1987, there is no medical evidence.  It is certainly reasonable to extend the BIF (borderline intellectual functioning) diagnosis back to that time and the dependent personality, but not the depression/anxiety---and, there is sense of worsening beginning perhaps in late 1987 and progressing into 1992. However, for the period age 22 to 1987, medical evidence would certainly support a severe impairment, but not of an allowance level.

Id.

## V.   ANALYSIS

Considering the record as a whole, this Court concludes Salmela's motion for summary judgment should be granted in part and denied in part, the Commissioner's motion denied, and that a remand is appropriate because the ALJ's factual findings, "are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision."  See Scott ex rel. Scott v. Astrue, 529 F.3d 818, 822 (8th Cir. 2008) (citations omitted).

First, contrary to the SSA and the law of the Eighth Circuit, the ALJ neither addressed the disability findings of the VA or the Merit Systems Board nor the evidence underlying these decisions, much less explained why he was rejecting the decisions of these agencies.  Indeed, the ALJ's decision does not even acknowledge the decisions of the VA or Merit Systems Board.

Social Security regulations provide in relevant part that:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability

> or blindness determination based on social security law.
> Therefore, <u>a determination made by another agency that you</u>
> <u>are disabled or blind is not binding on us.</u>

20 CFR § 404.1504 (emphasis added).   At the same time, the SSA, through Social

Security Ruling ("SSR") 06-3p, has set forth how it treats decisions made by other

governmental agencies on the issue of disability:

> <u>[W]hen we make a determination or decision of disability, we</u>
> <u>will consider all of the available evidence in the individual's</u>
> <u>case record. This includes</u> but is not limited to objective
> medical evidence . . . information from other nonmedical
> sources and <u>decisions by other governmental . . . agencies</u>
> about whether an individual is disabled or blind.
>
>                      * * *
>
> Because the ultimate responsibility for determining whether
> an individual is disabled under Social Security law rests with
> the Commissioner, <u>we are not bound by disability decisions</u>
> <u>by other governmental and nongovernmental agencies.</u> In
> addition, because other agencies may apply different rules
> and standards than we do for determining whether an
> individual is disabled, this may limit the relevance of a
> determination of disability made by another agency.
> <u>However, the adjudicator should explain the consideration</u>
> <u>given to these decisions in the notice of decision for hearing</u>
> <u>cases and in the case record for initial and reconsideration</u>
> <u>cases.</u>

SSR 06-3p, 71 F.R. 45593-03, 2006 WL 2263437 at *45594, 45596-97 (Aug. 9, 2006)

(emphasis added).   The ruling explicitly provides that "evidence of a disability decision

by another governmental or nongovernmental agency cannot be ignored and must be

considered."   <u>Id.</u> at *45596.

      Like the SSA, the Eighth Circuit has concluded that a disability determination by

a federal governmental agency is not binding on the Commissioner considering a Social

Security applicant's claim for disability benefits.   <u>See</u> <u>Morrison v. Apfel</u>, 146 F.3d 625,

628 (8th Cir. 1998) (citing <u>Jenkins v. Chater</u>, 76 F.3d 231, 233 (8th Cir. 1993)); <u>see</u> <u>also</u> <u>Bernauer v. Chater</u>, No. 3:94-cv-921RP, 1995 WL 803663 at *15 (N.D. Ind. Dec. 12, 1995) (finding that "OPM's finding of disability does not bind the SSA.") (citing 42 U.S.C. § 423(d); 20 C.F.R. § 404.1504). At the same time, the Eighth Circuit has determined that although an agency decision is not binding on the Commissioner, it is entitled to some weight, although not great weight, and must be considered. <u>See</u> <u>Morrison</u>, 146 F.3d at 628 (citations omitted); <u>see</u> <u>also</u> <u>Mack v. Chater</u>, No. 96-320, 1997 WL 488944 at *2 (8th Cir. Aug. 25, 1997) (citing 20 C.F.R. § 404.1504; <u>Jenkins</u>, 76 F.3d at 233; <u>Fisher v. Shalala</u>, 41 F.3d 1261, 1262 (8th Cir. 1994)).

Further, although an ALJ need not "discuss every piece of evidence presented," a federal agency's finding (in <u>Morrison</u>, the agency was the VA) of disability is "important enough to deserve explicit attention." <u>Morrison</u>, 146 F.3d at 628; <u>see</u> <u>also</u> <u>DuBois v. Barnhart</u>, 137 Fed. Appx. 920, 921 (8th Cir. 2005) (same) (citation omitted). In fact, the Eighth Circuit in <u>Morrison</u> rejected the Commissioner's argument that the ALJ's failure to address the VA's finding constituted an "implicit rejection" of the finding of disability by the VA, stating "[i]f the ALJ was going to reject the VA's findings, reasons should have been given, to enable a reasoned review by the courts." <u>Morrison</u>, 146 F.3d at 628. Since <u>Morrison</u>, the Eighth Circuit has indicated that it is sufficient for an ALJ to consider and discuss the underlying medical evidence contained in the agency's decision, without mentioning the decision. <u>See</u> <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 579-80 (8th Cir. 2006).[7]

---

[7]     <u>Pelkey</u> was issued in January 2006, and thus, the Eighth Circuit did not have the benefit of SSR 06-03p, issued in August 2006, which states that an "adjudicator should

In this case, the ALJ failed to follow the instructions of the SSA and the Eighth Circuit in making his decision – he made no reference to and never explained why he was rejecting the VA's decision on benefits or the Merit Systems Board's decision on survivor annuity benefits, and never discussed the records relied on by the Merit Systems Board to reach its decision including: the opinion of her high school counselor that Salmela was disabled while she was in high school; Dr. Etterman's opinion that Salmela had a learning disability and attention deficit order which dated back to birth; and the testimony from Dr. Kent Newman, the independent medical expert who testified at Salmela's SSI hearing in 1991, that Salmela's disabilities and impairment were long-standing in duration.

Second, the ALJ did not obtain or rely on an acceptable medical source for his finding that Salmela did not have a medically determinable impairment prior to the age of 22.  "[I]t is well-settled that the 'ALJ has a duty to fully develop the record fairly and fully, independent of the claimant's burden to press his case.'"  Scott ex rel. Scott, 529 F.3d at 824 (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)).  This duty "extends even to cases like [the claimant's] where an attorney represented the claimant at the administrative hearing."  Snead, 360 F.3d at 838 (citation omitted).  As the Eighth Circuit explained in Snead:

> The ALJ possesses no interest in denying benefits and must act neutrally in developing the record. See Richardson v. Perales, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994) (noting that the Commissioner and

---

explain the consideration given to these [agency] decisions."  See SSR 06-3p, 71 F.R. 45593-03, 2006 WL 2263437 at *45597.

claimants' counsel both share the goal of assuring that disabled claimants receive benefits).

Id.

The duty to develop the extent of a claimant's medical impairment is established by SSA Regulations, which provide that:

> (e) "When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.   To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available . . .
>
> (f) If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense. . . ."

20 C.F.R. § 416.912(e) and (f).

As the Regulations indicate, "[w]hen a claimant's medical records do not supply enough information to make an informed decision, the ALJ may fulfill this duty [to develop the medical record] by ordering a consultative examination." Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992).  "Moreover, '[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'" Id. (quoting Dozier, 754 F.2d at 276).  The duty to fully develop the record to determine a claimant's impairment is not satisfied by merely having the claimant's medical records reviewed by a medical consultant.  There must be adequate relevant medical evidence generated by a medical expert who has actually examined

the claimant, and not just the claimant's records.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  If the medical experts who have examined the claimant have not provided sufficient information to make a well-informed assessment of the claimant's impairments and residual functional capacity, then the ALJ must make suitable arrangements to obtain such information before deciding whether the claimant is disabled.  Id.

Additionally, only acceptable medical sources can offer a medical opinion; therefore, evidence from an acceptable medical source is required to establish a "medically determinable impairment," under step two of the sequential analysis.  SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. 2006) (citing 20 C.F.R. § 404.1513(a) and 416.913(a)).  Indeed, the social security regulations expressly provide that, "[w]e need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s)."  20 C.F.R. § 404.1513(a); see also, SSR 06-03p, 2006 WL 2329939 at *2 ("Only 'acceptable medical sources' can give us medical opinions.") (citing 20 CFR §§ 404.1513(a) and 416.913(a)).

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 CFR § 404.1527(a)(2) (emphasis added).  Social workers are not listed as an acceptable medical source.  They are considered to be "other sources," which "cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from

an "'acceptable medical source' for this purpose."  Social Security Ruling 06-03p, 2006 WL 2329939 at *2.[8]

The ALJ's decision cannot be upheld because he did not obtain or rely on an acceptable medical source for his determination on Salmela's impairments.  Further, he did not obtain an independent evaluation by an acceptable medical source, nor did he receive opinions from a medical expert at the hearing regarding the medical evidence and Salmela's impairment or lack of impairment.  Leitzke v. Callahan, 986 F. Supp. 1216, 1225 (D. Minn. 1997). ("[W]e find that the ME's testimony constituted substantial evidence that the Plaintiff met the Listings for disability with respect to his mental impairments, which included PTSD, depression, and chronic alcoholism.").  Instead, the ALJ referenced the evaluation of social worker Bumgardner, who the ALJ stated was unable to determine disability prior to age 18.  Tr. 20.  To the extent the ALJ was relying on Bumgardner's opinions on impairment,[9] she was not an acceptable medical source.

Third, the balance of the ALJ's analysis to determine whether Salmela had a medically determinable impairment was based on his own interpretation of the record, including Salmela's grades, standardized testing, the fact that Salmela had filed a 1991 SSI claim asserting a disability on the basis of metal impairments, and past WAIS-R scores.  But this is something that the ALJ cannot do – he cannot substitute his own

---

[8]     The SSA may use "other sources" "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939, at *2.

[9]     This Court notes that Bumgardner did not even provide an opinion on impairment before age 18.  All that she communicated to Salmela was that she had not received any documentation from Salmela's health providers that would indicate Salmela was disabled prior to age 18, and that any evaluation at this point could only address current level of functioning, but not the status of Salmela's functioning prior to age 18.  Tr. 525.

judgment for a competent medical opinion.  See Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (citing Fowler v. Bowen, 866 F.2d 249, 252 (8th Cir. 1989)) (finding that the law of the Eighth Circuit is that an "ALJ must not substitute his opinions for those of the physician.").  "[A]n administrative law judge may not draw upon his own inferences from medical reports." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975)); see also Nevland, 204 F.3d at 858 (same) (citation omitted).

In summary, while it is true that disability determinations by other agencies are not binding on an ALJ, the findings of these other agencies are entitled to some weight and must be considered in the ALJ's decision.  Therefore, if the ALJ was going to reject the findings of the VA or the Merit Systems Board regarding their decision to award benefits to Salmela, particularly where those decisions are based on the same types of medical conditions presented here, then reasons should have been given by the ALJ to explain that decision to enable a reasoned review by the courts.

Additionally, the determination of a medically determinable impairment cannot be made by the ALJ based on his own review and interpretation of the records (or lack of records).  This determination must be made by an acceptable medical source and if no such source can be found in the records, then it must be developed by the ALJ.

For all of these reasons, this Court finds that the ALJ's decision is not supported by substantial evidence in the record as a whole, and the Court remands this decision for further consideration.  On remand, in order to determine whether Salmela was suffering from medically determinable impairment prior to age 22 for the purposes of step two of the five-step analysis under 20 C.F.R. § 404.1520, the ALJ should be

directed to consider and then properly assess the weight that should be given to the disability findings by the VA and the Merit Systems Board, and the records relied upon by these agencies for their determinations.  The ALJ should then explain his decision to accept or reject the decisions of these other agencies and the records relied upon by them for their determinations.

In addition, the ALJ should be directed to specify the acceptable medical opinion he or she is relying upon to make the finding that Salmela did or did not have a medically determinable impairment prior to the age of 22, and if necessary, obtain an independent medical evaluation or testimony at the hearing from an acceptable medical source to assist in the determination.

Finally, to the extent that the Commissioner determines that Salmela has an impairment for the purposes of step two, the ALJ should continue with the remaining steps of analysis set forth in 20 C.F.R. § 404.1520 to determine whether Salmela is entitled to child insurance benefits.

## VI.   RECOMMENDATION

For the reasons set forth above, this Court cannot find that the decision by the ALJ to deny plaintiff disability benefits is supported by substantial evidence on the record as a whole.

THEREFORE, IT IS RECOMMENDED THAT:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 11] be **GRANTED in part and DENIED in part**;

2.      Defendant's Motion for Summary Judgment [Docket No. 22] be **DENIED**; and

3.    The case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.


Dated:          February 11, 2011

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge




Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 25, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.